**CONSUMERS UNION OF UNITED STATES, INC., Plaintiff,**

v.

**DEPARTMENT OF HEALTH, EDUCATION & WELFARE, et al., Defendants,**

and

**The Cosmetic, Toiletry and Fragrance Association Inc., Intervenor-Defendant.**

**Civ. A. No. 75–1250.**

United States District Court, District of Columbia.

March 12, 1976.

474

Nancy H. Chasen, Washington, D. C., for plaintiff.

Peter C. Schaumber, Asst. U. S. Atty., Kenneth Baumgartner, Associate Chief Counsel for Enforcement Food and Drug Administration, Washington, D. C., for defendants.

Eugene I. Lambert, Covington & Burling, Washington, D. C., for intervenor-defendant.

## MEMORANDUM AND ORDER

JOHN LEWIS SMITH, Jr., District Judge.

This case involves a relatively narrow legal question: Were the meetings held on April 9 and September 17, 1975 between Food and Drug Administration (FDA) officials and representatives of the Cosmetic, Toiletry and Fragrance Association, Inc. (CTFA, Intervenor) advisory committee meetings within the meaning of the Federal Advisory Committee Act (FACA, Act), 5 U.S.C. App. I? If so, they were invalidly held since under FACA the meetings should have been open to the public and the "advising" group authorized through administrative approval and chartering. *Id.* §§ 9, 10(a). If the sessions were not advisory committee meetings, they were valid private meetings similar to numerous agency-industry or agency-consumer gatherings taking place daily at FDA. The matter is before the Court on defendants' Motions to Dismiss or, in the Alternative, for Summary Judgment and plaintiff Consumers Union's Cross Motion for Summary Judgment.

The FDA has considered the desirability of labeling and of testing cosmetic ingredients since 1960. The initiative in these areas has moved back and forth from agency to industry, with industry representatives (acting at times to forestall pending legislation) proposing certain voluntary programs and FDA calling for refinements and clarifications in procedures. There now exist procedures for voluntary registration of cosmetic product establishments, for voluntary filing of cosmetic product ingredients, and for voluntary filing of cosmetic product experiences. 21 C.F.R. pts. 710, 720, 730 (1975); *see* 37 Fed.Reg. 23344 (1972); 36 Fed.Reg. 16934 (1971) (CTFA petitions for procedures). Regulations requiring cosmetic labeling have also been issued by FDA. 21 C.F.R. pt. 701 (1975).

In the area of testing cosmetic ingredients, FDA–CTFA efforts have in-

creased in the past two years.[1] Speaking at CTFA's annual meeting on February 27, 1974, FDA Commissioner Schmidt discussed the need for establishment of an ingredient review program. Another FDA official, Dr. Mark Novitch, stated: "Certainly, this kind of approach [i. e., cosmetic ingredient safety substantiation paralleling the drug review process] is something you should consider and we *will* consider in our common effort to increase our mutual assurance and the public's confidence in the safety of our cosmetic products." (Emphasis in original.)[2] CTFA had been developing a safety review program since 1972, and planning and consultation moved forward rapidly. After three exploratory meetings between FDA and CTFA representatives in 1974 and two briefing meetings in early 1975, CTFA requested a meeting with FDA to discuss CTFA's draft proposal. This meeting was held on April 9, 1975, and detailed minutes were kept for the session. Plaintiff's counsel subsequently requested permission to attend or participate in future FDA–CTFA meetings on the ingredient review proposal, invoking the Federal Advisory Committee Act. Commissioner Schmidt denied the request on grounds that these were private, CTFA-initiated meetings. Following the filing of this lawsuit, a second meeting was held on September 17, 1975 to discuss CTFA's revised proposal. Minutes were also kept for this meeting.

Resolution of the issues in this case requires a careful examination of FACA and its administrative and judicial construction. The Federal Advisory Committee Act was aimed at eliminating useless advisory committees, strengthening the independence of remaining advisory committees, and preventing advisory groups from becoming self-serving.[3] The Act defines advisory committee in a general, open-ended fashion. For purposes of this action, the term includes "any committee, board, commission, council, conference, panel, task force, or other similar group . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . [such] agencies. . . ." 5 U.S.C. App. I § 3(2)(C). The legislative history does not clarify the meaning of the words "utilized by" an agency. This language was added in conference and the intent was not clarified either in the report or on the floor. *See* H.R.Rep.No. 1403, 92d Cong., 2d Sess. 9 (1972); *Lombardo v. Handler*, 397 F.Supp. 792, 797–800 (D.D.C.1975). The Office of Management and Budget, charged with approving and overseeing advisory committees, 5 U.S.C. App. I §§ 9(a)(2), (c), 7(b)–(c), issued restrictive implementing guidelines for the Act which enumerated certain structural "characteristics" of advisory committees. 38 Fed.Reg. 2306, 2307 ¶ 4 (1973). These provisions, however, were superseded by new guidelines

1. A 1974 report by an FDA official, Dr. Richard J. Ronk, summarizes the impact of cosmetics upon the American consumer market: "The market for cosmetics in the United States has been estimated to be about $6 billion dollars annually. One source estimates that cosmetics and toiletries can be divided into 30 major product categories, which in 1971 consumed 2 billion pounds of chemical raw materials valued at $520 million dollars . . . .. Estimates of the number of cosmetic raw materials range from 3,000 to 13,000, exclusive of perfumes and color additives. The 1973 *CTFA Cosmetic Ingredient Dictionary* lists some 1530 substances. . . ." Exh. A to Pl.'s Mem. in Support of Cross Motion for Summary Judgment, at 3, filed Feb. 3, 1976.

2. Attachment to Fed.Defs.' Answers to Pl.'s Written Interrogatories, at 8, filed Dec. 18,

1975; *see also* Fed.Defs.' Mem. to Court, filed Feb. 25, 1976 (text of FDA Commissioner Schmidt's speech of Feb. 27, 1974 to CTFA).

3. *See* Comment, The Federal Advisory Committee Act, 10 Harv.J.Legis. 217, 225–34 (1973); *see also* 5 U.S.C. App. I §§ 2(a)–(b); H.R.Rep.No.1731, 91st Cong., 2d Sess. (1970) (detailed study of federal advisory committees, with legislative recommendations). *See generally* Perritt & Wilkinson, Open Advisory Committees and the Political Process: The Federal Advisory Committee Act After Two Years, 63 Geo.L.J. 725, 731–36 (1975) (legislative history of Act's provisions for open, public meetings); Tuerkheimer, Veto by Neglect: The Federal Advisory Committee Act, 25 Am.U.L.Rev. 53 (1975) (critique of Act's minimal impact upon federal agencies).

which define advisory committee in the same way as the Act. 39 Fed.Reg. 12389 (1974).

Several recent cases have interpreted FACA and afford some guidance to the Court in determining what constitutes an advisory committee under the Act. In *Nader v. Baroody*, 396 F.Supp. 1231 (D.D.C.1975), appeal pending (D.C. Cir., No. 75–1969), the court held that certain bi-weekly meetings with various constituent and interest groups at the White House did not come within FACA's reach. The meetings were found to be of a random nature, without formally organized groups, without presidential request for policy recommendations, and without any continuity or follow-up. Further, to have applied the Act so as to impinge upon the effective discharge of the President's business might have raised serious constitutional questions. *Id.* at 1234 & n. 5.

In *Food Chemical News, Inc. v. Davis*, 378 F.Supp. 1048 (D.D.C.1974), the court held as subject to FACA an agency's informal meetings with consumer and distilled spirits industry representatives relative to drafting proposed ingredient labeling regulations. The agency was considering amendments to a regulatory matter within its authority, it had solicited comments and suggestions from the two groups, and it intended to utilize such views in drafting its amended regulations. Noting the dangers of special interest groups exercising undue influence upon agencies, the court ordered pursuant to FACA that the meetings be open to the public. *Id.* at 1051–52.

The matter before the Court involves a factual situation different from the above-mentioned cases. The meetings complained of here were not ad hoc amorphous or casual group meetings as in *Nader v. Baroody, supra.* The FDA–CTFA conferences were the culmination of many months of planning, consulting, and revising. On the other hand—and unlike *Food Chemical News, supra*—the two meetings were not called to consider proposals dealing with impending agency action.[4] They were essentially consultations concerning the *group's own* proposal. This is a crucial factor for determining the group's status under the Act.

At the April 9 and September 17, 1975 meetings, the FDA was primarily responding and reacting to a CTFA-initiated, CTFA-administered program. Industry concerns about the applicability of warning statement regulations to the testing program were answered. *See* 21 C.F.R. §§ 740.1, 740.10 (1975). The mechanics of the review process were probed and certain weaknesses pointed out by FDA, such as potential conflicts of interest in the expert panel and lack of public involvement. The agency also explored its role in the program, i. e., "how the proposed program would interface with the FDA regulatory process."[5]

---

[4] The FDA, in fact, appears to lack statutory authority to require initiation of an ingredient testing program. Legislation providing for cosmetic safety substantiation has been introduced in the 93d and 94th Congresses. *See* S. 863, § 203, 93d Cong., 1st Sess. (1973); S. 1681, § 101, *as reported*, 94th Cong., 2d Sess. (1976); *see also* Hearings on S. 863 and S. 3612 Before the Subcomm. on Health of the Senate Comm. on Labor and Public Welfare, 93d Cong., 2d Sess. 36–37, 55–60, 67–72, 236–37, 452–54 (1974) (testimony of proponents and opponents concerning FDA's cosmetic testing authority); Hearing on S. 1681 Before the Subcomm. on Health of the Senate Comm. on Labor and Public Welfare, 94th Cong., 1st Sess. 2–3 (1975) (remarks of Sen. Eagleton, sponsor of S. 863 and S. 1681). *Compare* 21 U.S.C. § 355 (premarketing clearance procedures for new drugs, upheld in *Weinberger v.*

*Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973)). Such lack of specific statutory authority does not *ipso facto* preclude FDA from appointing an appropriate advisory committee on the subject, although the Act does require an advisory committee to concern itself with "the performance of duties imposed on [the] agency by law." 5 U.S.C. App. I § 9(a)(2). To interpret the statutory requirement so narrowly would be an unduly rigid construction of a remedial Act as well as inconsistent with the FDA's general statutory and regulatory authority over cosmetics. *See* 21 U.S.C. §§ 321(i), 331–34, 361–62.

[5] Memorandum of April 9, 1975 Conference, at 2, Exh. F to Fed.Defs.' Motion to Dismiss or, in the Alternative, for Summary Judgment, filed Oct. 29, 1975. The role of the FDA in the

FDA identified three areas where its input and further consideration might be necessary: selection of ingredients for review, composition of the program's expert panel, and publication of final reports. At these two meetings, CTFA plainly appears as proponent of a plan and FDA as critic recommending appropriate revisions.

Based on the record, the Court finds that CTFA was not advising the FDA about the cosmetic ingredient testing program. CTFA was presenting a voluntary, industry-sponsored proposal and seeking the FDA's comments and advice. For a variety of reasons including budget limitations, statutory authority, and other important priorities, the FDA had been unable either to develop or to require a cosmetic testing program. Under these circumstances CTFA took the initiative. This is the converse of *Food Chemical News, supra,* where the agency, acting under clear regulatory authority, solicited industry and consumer viewpoints on amendments which the agency itself was preparing. Granting that FDA had frequently expressed its concern for cosmetic ingredient testing, the Court finds that planning had evolved beyond agency control. CTFA in its own discretion was ultimately to decide whether or not to initiate a testing program. Such a relationship of agency and group does not rise to the level of a FACA "advisory" relationship.

testing program has been and remains a thorny problem which casts doubt on the proposal's viability. *See, e. g., id.* at 2–4 (ingredients proven unsafe to be referred to FDA for regulatory action); Memorandum of Sept. 17, 1975 Conference, at 2–3, attached to Fed.Defs.' Answers, *supra* note 2 (discussion of FDA's providing a liaison representative to expert review panel); Memorandum of Dec. 19, 1974 Meeting, at 2, attached to Fed.Defs.' Answers, *supra* note 2 (consideration of FDA preclearance review responsibilities under proposal).

Without FDA's involvement in the expert review panel, or in the event FDA sought greater participation in the testing program, CTFA has indicated that it would reconsider the whole proposal. *See* Memorandum of Sept. 17, 1975 Conference, *supra,* at 2–3.

*Compare Wolfe v. Weinberger,* 403 F.Supp. 238, 240–41 (D.D.C.1975).

For essentially the same reasons, the FDA–CTFA contacts here cannot comport with the Act's directive that the *agency* and not the advisory committee determine "action to be taken and policy to be expressed." 5 U.S.C. App. I § 9(b); *see also* id. § 2(b)(6). Congress intended that federal decisionmakers, not their advisers or delegatees, execute federal policy.[6] In the present matter FDA was not undertaking a regulatory program. Indeed, there are serious questions as to whether FDA had the authority to sponsor an ingredient testing program. *See* note 4, *supra.* At issue were not agency policy matters which FDA could consider and resolve, with assistance from an advisory group. Rather, FDA had before it a voluntary plan drafted by CTFA, to be amended by CTFA, and eventually to be implemented or rejected by CTFA. In the final analysis, the action to be taken and the decisions to be made were unilateral. The Court concludes that FDA was not obtaining advice or recommendations from CTFA at the meetings and that the parties were therefore not bound by the provisions of the Federal Advisory Committee Act. Neither chartering of CTFA nor public access to FDA–CTFA meetings is required.[7]

### ORDER

Accordingly, upon consideration of Federal Defendants' and Intervenor's

6. S.Rep.No.1098, 92d Cong., 2d Sess. 13–14 (1972). In this regard, it should be noted that the Act contains no bar to advisory committees composed of industry representatives. The "balanced membership" requirement applies, strictly speaking, only to legislatively established committees. 5 U.S.C. App. I §§ 5(b) (2)–(3), (c). Congress refused to adopt specific standards for committee membership, including a proposal for one-third "public" membership. *See* Comment, *supra* note 3, at 228–30, 233–34; *cf.* 118 Cong.Rec. 31225 (1972) (statement in Senate during conference report consideration approving trade association members on advisory committees).

7. Having decided the matter on essentially statutory grounds, the Court need not reach the First Amendment claims raised by Intervenor CTFA and the amici curiae in this action.

Motions to Dismiss or, in the Alternative, for Summary Judgment, Plaintiff's Cross Motion for Summary Judgment, the memoranda of points and authorities in support thereof and in opposition thereto, oral argument of counsel having been heard, and for the reasons set forth in the accompanying Memorandum, it is by the Court this 12th day of March, 1975

ORDERED that Federal Defendants' and Intervenor's Motions for Summary Judgment be, and the same hereby are, granted; and it is further

ORDERED that plaintiff's Cross Motion for Summary Judgment be, and the same hereby is, denied.